**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| KALSHIEX LLC,<br><br>Plaintiff,<br><br>v.<br><br>CATHERINE HANAWAY, in her official capacity as Missouri Attorney General; the MISSOURI GAMING COMMISSION; MICHAEL A. LEARA, in his official capacity as Executive Director of the Missouri Gaming Commission; JAN M. ZIMMERMAN, in her official capacity as Chairman of the Missouri Gaming Commission; KEVIN SPAULDING, KEVIN CANTWELL, SAM K. GLADNEY, and ROGER STOTTLEMYRE, in their official capacities as Commissioners of the Missouri Gaming Commission,<br><br>Defendants. | Civil Action No. 4:26-cv-1860 |

**<u>COMPLAINT</u>**

## INTRODUCTION

1. This action challenges the State of Missouri's clear violation of the Supremacy Clause with respect to the regulation of event contracts. The federal Commodity Exchange Act ("CEA") grants the Commodity Futures Trading Commission ("CFTC") "exclusive jurisdiction" over event contracts when they are "traded or executed on a contract market" that has been federally "designated" for that purpose. 7 U.S.C. § 2(a)(1)(A). Plaintiff KalshiEX LLC ("Plaintiff" or "Kalshi") operates a federally designated contract market ("DCM") on which the CFTC has permitted it to trade sports event contracts.

2. But Missouri has taken a different view, demanding that Kalshi cease offering its sports event contracts to persons in Missouri or comply with Missouri's licensing and related requirements. On September 16, 2026, Missouri Attorney General Catherine L. Hanaway sent Kalshi a cease-and-desist letter addressed to KalshiEX LLC, asserting that Kalshi operates an unlicensed online sports wagering platform in Missouri and demanding that Kalshi cease and desist or satisfy specified state licensing, tax, fee, and age restrictions. *See* Ex. 1. Attorney General Hanaway also recently signed an amicus brief arguing that Kalshi's contracts violate state gambling laws and asking the Supreme Court to review the decision in Kalshi's favor by the United States Court of Appeals for the Third Circuit. Amicus Br., *Flaherty v. KalshiEX, LLC*, No. 26-299 (U.S. Oct. 7, 2026). And earlier this year, Michael A. Leara, Executive Director of the Missouri Gaming Commission (the "Commission"), submitted on behalf of the Commission a comment letter to the CFTC, providing corroborating background and urging that the CFTC "properly reserve jurisdiction over sports event contracts for the states, as intended by Congress." Comment Letter from Mo. Gaming Comm'n to Commodity Futures Trading Comm'n (Apr. 30, 2026), https://perma.cc/9D8J-GEMQ.

3. Missouri law contemplates criminal and civil sanctions for unlawful gambling transactions and sports wagering activity, including under Mo. Rev. Stat. §§ 572.020, 572.030, 572.040, 572.050, 572.060, 572.070, 11 C.S.R. §§ 45-20.150, 45-20.360(8) and Mo. Const. art. III, § 39(g). The sports-wagering regime provides for licensing, license and renewal fees, and a 10% wagering tax; prohibits wagers by persons under 21; and imposes an affirmative duty on online sports wagering platforms to actively prevent such wagers.

4. The consequences are severe. Mo. Rev. Stat. §§ 572.030 and 572.050 include a Class E felony for promoting gambling in the first degree and possession of gambling records in the first degree, respectively. Missouri law also authorizes administrative fines of $50,000 per violation, or $100,000 for violations arising from the same occurrence of events. Mo. Const. art. III, § 39(g)(4)(k); 11 C.S.R. 45-20.150(4), (5).

5. Missouri's attempt to prohibit Kalshi from operating is a form of regulation that intrudes on the federal scheme. The letter gives Kalshi only two options: cease and desist, or obtain a Missouri Gaming Commission license, pay all associated state taxes and fees, and stop serving Missourians under 21 years of age. The letter demanded confirmation of compliance or cessation by October 16, 2026, and warned that Missouri will otherwise pursue enforcement and take legal action. Ex. 1 at 3. On October 15, 2026, the Attorney General's Office granted Kalshi a two-week extension of that deadline, to October 30, 2026, but on October 27, 2026, the Solicitor General of Missouri told Kalshi that it could not agree to withhold enforcement against Kalshi, placing Kalshi at imminent risk that Missouri would pursue an enforcement action against it.

6. The Supremacy Clause does not tolerate that result. Ceasing operations would place Kalshi in tension with, and could jeopardize its compliance with, the CFTC's impartial-access requirement, which requires a DCM to provide its members and other eligible participants

with impartial access to its markets and services, among other things. 17 C.F.R. § 38.151(b). Indeed, the CFTC has already filed suit in many courts seeking injunctive relief against other states' unconstitutional attempts to circumvent federal law and impose their own regulations on DCMs.[1] And the letter's alternative—that Kalshi "obtain a license"—presents a demand Kalshi cannot satisfy, as explained below. *See infra* ¶ 9. As such, Kalshi faces an imminent risk that Defendants will attempt to enforce Missouri's preempted state laws against it.

7. Plaintiff Kalshi seeks injunctive and declaratory relief to prevent Missouri officials from enforcing Mo. Rev. Stat. §§ 513.660, 572.010, 572.020, 572.030, 572.040, 572.050, 572.060, 572.070, 407.020, Mo. Const. art. III, § 39(g), 11 C.S.R. §§ 45-20.100 *et seq.*, and any other Missouri law against Kalshi based on its operation of a federally regulated DCM.

8. The merits of Kalshi's preemption claim are plain. The CEA grants the CFTC "exclusive jurisdiction" over instruments, including "swaps," traded on DCMs. 7 U.S.C. § 2(a)(1)(A). The CEA then provides that "swaps" include event contracts, defining the term "swap" to cover a "contract" for a "payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). The CEA also expressly grants the CFTC—*and only the CFTC*—the power to bar "event contracts" involving "gaming" from DCMs if the CFTC determines that trading in those contracts is not in the "public interest." *Id.* § 7a-2(c)(5)(C). Using that delegated authority, the CFTC recently promulgated a

[1] *See* Complaints filed at Dkt. No. 1 in *United States v. Arizona*, No. 26-cv-2246 (D. Ariz. Apr. 2, 2026); *United States v. Connecticut*, No. 26-cv-498 (D. Conn. Apr. 2, 2026); *United States v. Illinois*, No. 26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States v. New York*, No. 26-cv-3404 (S.D.N.Y. Apr. 24, 2026); *United States v. Wisconsin*, No. 26-cv-749 (E.D. Wis. Apr. 28, 2026); *United States v. Minnesota*, No. 26-cv-2661 (D. Minn. May 19, 2026); *United States v. New Mexico*, No. 26-cv-1912 (D.N.M. June 12, 2026); *United States v. Kentucky*, No. 26-cv-49 (E.D. Ky. June 23, 2026); *United States v. Utah*, No. 26-cv-01055 (D. Utah Oct. 26, 2026); and Intervenor Compl., *KalshiEX LLC v. Furcolo*, No. 26-cv-327 (D.R.I. June 26, 2026), Dkt. No. 37 (collectively, the "CFTC Complaints").

Notice of Proposed Rulemaking ("NPRM") that sets out a detailed federal framework regulating the trading of sports event contracts on DCMs, which is expected to be final within the next two months. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (proposed June 12, 2026) (to be codified at 17 C.F.R. pt. 40); Fed. Pls.' Resp. to Defs.-Appellants' Mot. for Summ. Disposition at 2, *CFTC v. Johnson*, No. 26-4281 (9th Cir. Sep. 24, 2026), Dkt. No. 29.1. And exercising its express statutory authority to further define the term "swap," 15 U.S.C. § 8302(d)(1), the CFTC has since issued an Interim Final Rule, effective immediately, excluding from the "swap" definition casino-style gambling products that are regulated under state law and not traded on an organized exchange,[2] and proposed a rule defining "swaps" to include "[e]vent contracts, including those based on sports-[related] . . . events."[3] Elsewhere in the federal code, Congress has made clear that transactions executed on DCMs are *not* bets or wagers. *See* 31 U.S.C. § 5362(1)(E)(ii) (providing that the term "bet or wager" "does not include" transactions conducted on "a registered entity . . . under the Commodity Exchange Act").

9. Missouri's intent to prohibit Kalshi from operating contravenes all these Congressional commands. It asserts state jurisdiction over event contracts traded on DCMs, and it would subject sports event contracts to state regulatory requirements that squarely conflict with the federal ones. In Defendants' view, Kalshi may not offer sports event contracts in Missouri unless the Missouri Gaming Commission grants it a license. But no license is realistically available to Kalshi. Missouri authorizes two categories of sports wagering operator licenses: retail licenses and mobile licenses. Mo. Const. art. III, § 39(g)(16)(d). Retail licenses may be issued only to

---

[2] Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969, 65,971, 65,979 (Oct. 19, 2026).

[3] Further Definition of "Swap" – Inclusions, 91 Fed. Reg. 66,022, 66,031 (proposed Oct. 19, 2026) (to be codified at 17 C.F.R. pt. 1).

licensed casino operators (*i.e.*, Class B licensees), professional sports teams, or sports wagering operators acting on behalf of either pursuant to a commercial agreement. Mo. Const. art. III, § 39(g)(4)(a); 11 C.S.R. § 45-20.020(2). Kalshi is none of those. Mobile licenses may similarly be issued either to Class B licensees, professional sports teams, or operators acting on their behalf, Mo. Const. art. III, § 39(g)(4)(b), or directly to sports wagering operators without such affiliations ***subject to*** a statewide limit of two direct licenses, *id.* § 39(g)(4)(c). Again, Kalshi does not qualify for the former. And the latter is not available to Kalshi either because the Commission has already issued both of the direct licenses. Mo. Gaming Comm'n, Resolution No. 25-139, Regarding Selection of Top Two Qualified Applicants for a Direct Mobile License (Aug. 15, 2025), https://perma.cc/N6KD-CCAD; Mo. Gaming Comm'n, Resolution No. 26-022, Regarding Licensure of Mobile Sports Wagering Platform Circa Hospitality Group I LLC, d/b/a Circa Sports (Apr. 29, 2026), https://perma.cc/L35G-E8VD; Mo. Gaming Comm'n, Resolution No. 26-023, Regarding Licensure of Mobile Sports Wagering Platform DK Crown Holdings Inc., d/b/a DraftKings (Apr. 29, 2026), https://perma.cc/TH9Z-3BPL.

10. Even if Kalshi could obtain a license, which it cannot under Missouri's own regime, it could not operate within that regime without jeopardizing its federal designation. Missouri law requires licensed operators to comply with a host of state-specific restrictions that cannot be reconciled with the CEA. Licensees may not accept "any wager of any type or kind, unless the type or kind of wager and subject of the wager has been approved by the commission," and may accept wagers "only" on "events approved by the commission and published in the catalog of approved events." 11 C.S.R. §§ 45-20.450(1), 45-20.340(1). Federal law, by contrast, allows DCMs to list contracts through self-certification with prior CFTC approval optional. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2. Federal law also permits event contracts on a far broader range of

occurrences than Missouri's approved-events catalog. *See* 7 U.S.C. § 1a(19)(iv). Missouri also bans entire categories of wagers. 11 C.S.R. § 45-20.360. The Commission may further "restrict, limit, or exclude" any type of wagering, or wagering on any event, that it concludes "would be contrary to public policy." *Id.* § 45-20.350(1). Congress, however, assigned those determinations—both categorical and event-specific—to the CFTC through a federal public-interest review process with a 90-day review period. *See* 7 U.S.C. § 7a-2(c)(5)(C); 17 C.F.R. § 40.11(c). Missouri law additionally prohibits licensees from accepting wagers from "a partnership, a corporation, an association, or any other entity that is not an individual." 11 C.S.R. § 45-20.360(4). The CEA, by contrast, permits Kalshi to offer its event contracts to business entities. *See* 7 U.S.C. § 1a(38). Missouri's regime would thus subject Kalshi to a parallel state-level approval, exclusion, and eligibility regime that is impossible to reconcile with the comprehensive federal framework governing DCMs.

11. The alternative, ceasing to offer sports event contracts in Missouri, would bring Kalshi ***out*** of compliance with federal law, as the CFTC's longstanding regulations—implemented to protect the same users Missouri is now claiming remain vulnerable—require DCMs to provide "impartial access" to their markets and prevent "market disruptions." 17 C.F.R. §§ 38.151(b), 38.255.

12. Nor can Kalshi simply disregard the State's position. Enforcement could bring criminal prosecution, including felony charges, administrative penalties, civil forfeiture, or abatement suits. Any such action would impair Kalshi's existing contracts, expose its users to uncertainty, loss, and potential penalties, undermine confidence in its platform, and jeopardize its status as a CFTC-approved exchange. All of these consequences would flow from Kalshi's

engagement in conduct that is federally authorized and approved by the federal agency with "exclusive jurisdiction."

13. In short, Defendants' threatened enforcement of Missouri law is preempted several times over. Applying Missouri's gambling and sports-wagering laws to Kalshi's exchange would expressly violate the CEA's "exclusive jurisdiction" provision by asserting concurrent state jurisdiction over sports event contracts traded on federally regulated DCMs. It would intrude on the field of exchange-traded derivatives that Congress has reserved entirely for the federal government. And it would force Kalshi to choose between violating federal law and facing criminal prosecution, forfeiture, and civil enforcement under state law.

14. Multiple courts have recognized that analogous state efforts to regulate event contracts traded on a DCM under state gaming statutes are flatly preempted. For example, the Third Circuit upheld a district court's determination that Kalshi is entitled to a preliminary injunction against New Jersey's efforts to enforce its gaming laws against Kalshi, explaining that, because "Congress gave the CFTC exclusive jurisdiction over trades on DCMs," the CEA "preempts [state] law from reaching into Kalshi's CFTC-licensed DCM." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026). The Ninth Circuit agreed that the CEA "expressly preempts state law regulating swaps 'traded or executed on' a DCM." *KalshiEX LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *7, *15 (9th Cir. Aug. 28, 2026) (agreeing that the CEA preempts state regulation of swaps traded or executed on a DCM, but holding that Kalshi's sports event contracts were likely not swaps); *but see KalshiEX LLC v. Schuler*, Nos. 26-3196, 26-5235, 2026 WL 2884087, at *1 (6th Cir. Sep. 25, 2026) (holding Kalshi's event contracts are not swaps and the CEA does not preempt Ohio or Tennessee gambling laws). District courts in Arizona and Minnesota reached the same conclusion in issuing preliminary injunctions, barring officials in each

state from enforcing state laws against Kalshi and other similar exchanges for offering event contracts in those states. *See, e.g.*, *KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954, 964 (D. Ariz. 2026); *United States v. Minnesota*, No. 0:26-cv-2661, 2026 WL 2150211, at *1 (D. Minn. July 27, 2026). And earlier this month, the Northern District of Illinois preliminarily enjoined Illinois officials from enforcing that State's gambling laws against Kalshi, holding that Kalshi's contracts are swaps under the CEA's plain text and that state law is preempted because "Illinois attempts to regulate how Kalshi's swaps can be structured and what sorts of sporting events they can relate to." *Coinbase Fin. Mkts., Inc. v. Raoul*, No. 1:25-cv-15406, 2026 WL 2969682, at *6–7, *14–15, *18 (N.D. Ill. Oct. 2, 2026).[4]

15. Kalshi is similarly entitled to a preliminary injunction barring Missouri from enforcing Mo. Rev. Stat. §§ 513.660, 572.010, 572.020, 572.030, 572.040, 572.050, 572.060, 572.070, 407.020, Mo. Const. art. III, § 39(g), 11 CSR §§ 45-20.010 *et seq.*, or any other state laws against it for offering event contracts within the state. By threatening enforcement, Missouri has taken an extraordinary step in challenging the CFTC's exclusive jurisdiction to regulate DCMs pursuant to the CEA. Missouri apparently deems itself unencumbered by the Supremacy Clause and federal law such that it is free to impose its own regulatory regime on a 50-state federal derivatives exchange that is operating in conformance with federal law, as confirmed by its

[4] While some district courts have denied preliminary relief to Kalshi, Kalshi has appealed those decisions to vindicate its right to operate free from state interference. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), *appeal argued*, No. 25-1892 (4th Cir. May 7, 2026); *KalshiEX LLC v. Bird*, No. 4:26-cv-00109-SHL-HCA (S.D. Iowa Sep. 8, 2026), *appeal docketed*, No. 26-2874 (8th Cir. Sep. 17, 2026); *KalshiEX LLC v. Williams*, No. 1:25-cv-08846, 2026 WL 1961872 (S.D.N.Y. July 7, 2026), *appeal pending*, No. 26-1835 (2d Cir.); *KalshiEX LLC v. Cafferelli*, No. 3:25-cv-2016, 2026 WL 2294589 (D. Conn. Aug. 10, 2026), *appeal pending*, No. 26-2239 (2d Cir.); *KalshiEX LLC v. Cox*, No. 2:26-cv-00151, 2026 WL 2241564 (D. Utah Aug. 4, 2026), *appeal pending*, No. 26-4100 (10th Cir.); *see also* Order, *United States v. Wisconsin*, No. 26-cv-00749 (E.D. Wis. July 29, 2026), *appeal docketed*, Nos. 26-2675, 26-2636, 26-2696 (7th Cir.).

exclusive federal regulator. A preliminary injunction is necessary to restore the federal-state balance that the Constitution mandates.

16. The Supremacy Clause is designed to prevent this intolerable situation by making clear that—where federal and state law conflict—state law must give way. Kalshi therefore respectfully requests that this Court grant the preliminary and permanent injunctive and declaratory relief necessary to restore the federal government's exclusive jurisdiction over event contracts traded on DCMs.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal question presented is whether Missouri gambling laws and Missouri's sports wagering laws and regulations, including Mo. Const. art. III, § 39(g) and 11 C.S.R. § 45-20.360, are preempted by the CEA, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

18. The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. Under the Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123 (1908), "a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011).

19. Venue is proper under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

20. Plaintiff Kalshi is a financial services company with its principal place of business in New York. Kalshi operates a derivatives exchange and prediction market where users can buy

and sell financial products known as event contracts. Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq*.

21. Defendant Catherine L. Hanaway is sued in her official capacity as Missouri Attorney General. As the State's chief legal officer, she is authorized to institute "all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state." Mo. Rev. Stat. § 27.060. Attorney General Hanaway personally issued the September 16, 2026 cease-and-desist letter threatening enforcement against Kalshi. Ex. 1.

22. Defendant Missouri Gaming Commission is sued as the state agency that licenses and regulates gaming in Missouri, Mo. Rev. Stat. § 313.004, including by issuing sports wagering licenses, adopting and enforcing sports wagering rules, and imposing fines on persons holding or required to hold a sports wagering, Mo. Const. art. III, § 39(g). The Commission asserts authority over sports wagering), as it stated in its public comment to the CFTC.

23. Defendant Michael A. Leara is sued in his official capacity as Executive Director of the Missouri Gaming Commission.

24. Defendant Jan M. Zimmerman is sued in her official capacity as Chairman of the Missouri Gaming Commission.

25. Defendants Kevin Spaulding, Kevin Cantwell, Sam K. Gladney, and Roger Stottlemyre are sued in their official capacities as Commissioners of the Missouri Gaming Commission.

26. Together, Defendants Hanaway, the Missouri Gaming Commission, Leara, Zimmerman, Spaulding, Cantwell, Gladney, and Stottlemyre would be responsible for enforcing the State's formal demand that Kalshi comply with Missouri state law, including the September 16, 2026 cease-and-desist letter, insofar as that law is preempted by federal law.

## FACTUAL ALLEGATIONS

### A. An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.

27. Derivatives contracts are financial tools used to mitigate risk. Event contracts are a quintessential example of a derivatives contract. They identify a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether a magnitude 8 earthquake will take place in Los Angeles County before January 1, 2027. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

28. Event contracts are typically traded on an exchange—like the nationwide DCM operated by Kalshi—on which traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house." Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place."). Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

29. The value of an event contract on a DCM like Kalshi is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices.

The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

30. Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by data points the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

31. Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other widely available financial instrument with this unique capability to capture the risks of an event with potential economic consequences, which is a benefit not only to those that wish to hedge risk or seek return, but also to market observers and other economic actors.

32. To give just some of the many examples, this past February, researchers at the Federal Reserve published a paper in which the "results suggest that Kalshi markets provide a high-frequency, continuously updated, distributionally rich benchmark that is valuable to both researchers and policymakers."[5] Findings in that paper included that "Kalshi markets are well-

---

[5] Anthony M. Diercks, Jared Dean Katz & Jonathan H. Wright, *Kalshi and the Rise of Macro Markets* 1, Fin. & Econ. Discussion Series Paper 2026-010, Bd. of Governors of the Fed. Rsrv. Sys. (Feb. 12, 2026), https://perma.cc/9EY4-M3HY.

behaved and broadly consistent with those from more established financial instruments," and that "in several episodes, they allocate probability mass in ways that may reflect the range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts."[6] Further, Kalshi's "median and mode have a perfect forecast record on the day before the [Federal Open Market Committee] meeting, which represents a statistically significant improvement over the fed funds futures forecast,"[7] and, for headline consumer price index forecasts, "Kalshi provides a statistically significant improvement over the Bloomberg consensus forecast."[8] And, "Kalshi provides real-time, distributional forecasts for macroeconomic variables such as GDP, core CPI, and unemployment—markets for which options data have historically been unavailable."[9]

33. Other examples abound: in February, Kalshi announced a partnership with Tradeweb, a leading global operator of electronic marketplaces for rates, credit, equities, and money markets, which facilitates more than $2.6 trillion in notional value of instruments traded per day.[10] The partnership expands institutional access to data from Kalshi's market and facilitates trading by those same institutional investors on Kalshi's platform.[11]

34. And late last year, the real estate investment firm Arrived announced its plans to utilize Kalshi's event contracts to hedge the risk of a government shutdown impacting its business.[12] Kalshi's markets are not the province of large institutions alone: innumerable businesses used the platform to hedge in the past month, and Kalshi is expanding that access

---

[6] *Id.* at 2-3.
[7] *Id.* at 3.
[8] *Id.*
[9] *Id.*
[10] Tradeweb and Kalshi Announce Strategic Partnership to Expand Institutional Access to Prediction Markets, Tradeweb (Feb. 19, 2026), https://perma.cc/TX3T-V9XA.
[11] *See* Katherine Doherty & Sridhar Natarajan, *Wall Street Bond-Trading Hub Tradeweb Strikes Deal with Kalshi*, Bloomberg (Feb. 19, 2026), https://perma.cc/K292-RLGK.
[12] *See* Ryan Frazier, LinkedIn (2025), https://perma.cc/CQN6-JK3M; *see also* Michael J. de la Merced, *Kalshi, a Prediction Market, Raises $1 Billion in a New Round,* N.Y. Times DealBook (Dec. 2, 2025), https://perma.cc/VUY8-HCDT.

further.[13] Last month, Kalshi announced a partnership with the United States Hispanic Chamber of Commerce—the nation's largest small business advocacy group—and the Greater Washington Hispanic Chamber of Commerce, to provide risk-management tools and financial education to small businesses that have historically lacked access.[14]

35. The cease-and-desist letter is focused in particular on Kalshi's sports event contracts. But these are swaps that fall under the CFTC's exclusive jurisdiction. That is because, as both courts and the CFTC have recognized, sporting events can have significant economic consequences for a broad ecosystem of stakeholders. *Raoul*, 2026 WL 2969682, at *8-11; *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025); Amicus Br. of CFTC at 23-24, *KalshiEX LLC v. Cafferelli*, No. 26-2239 (2d Cir. Oct. 7, 2026), Dkt. No. 46.1 ("CFTC Amicus Br."); 91 Fed. Reg. at 66,025-26, 66,028, 66,031. Advertisers, sponsors, television networks, local communities, sportsbooks, and others all stand to gain or lose substantial sums depending on the outcomes of sports events.[15] Sports event contracts thus offer these entities opportunities to hedge their exposure. And that is happening in the market right now.

36. Take, for example, Game Point Capital, a sports-focused insurance firm that works with college athletic departments, pro teams, and sponsors to insure risk related to performance bonuses, coach salary buyouts, postseason and ticket revenue, and other areas of economic

---

[13] Mary Cunningham, *Small Businesses Roll the Dice on Kalshi to Manage Their Risks*, CBS News (Sept. 24, 2026), https://www.cbsnews.com/news/kalshi-small-business-hedge-financial-risk/.

[14] *How Hispanic-Owned Small Businesses Can Use Prediction Markets To Hedge Risk*, Kalshi News (Sept. 15, 2026), https://news.kalshi.com/p/how-hispanic-owned-small-businesses-can-use-prediction-markets-to-hedge-risk.

[15] L. Solomon & R. Givone, *The Financing Gap in Sports: Unlocking a $2.5 Trillion Opportunity*, Apollo (Aug. 11, 2026), https://perma.cc/6AVP-ZT9K.

exposure.[16] Game Point Capital uses Kalshi to hedge, and it intends to do so for $30 million in risk annually.[17]

37. Other market participants have recognized the hedging utility of sports event contracts as well. In an April 2026 submission to the CFTC on event contracts and prediction markets, Susquehanna International Group explained that media companies and advertisers use sports-related event contracts to hedge risks tied to viewership, game outcomes, point spreads, and totals, and that businesses are already using these markets to hedge real economic risks.[18] Similarly, Underdog Sports, a fantasy sports company, used Kalshi as a tool to "hedge against volatility" on its own platform.[19]

38. Small businesses are doing the same. This past June, a New York City bar promised customers free tabs if the Knicks won Game 1 of the NBA Finals, and it used Kalshi to offset that risk. The last time the bar had run a Knicks-based promotion, it lost $4,000.[20] A Washington, D.C. bar likewise used Kalshi to hedge a promotion tied to Team USA's World Cup results.[21]

39. Event contracts—including sports event contracts—are also a valuable means of communicating information to the public because contract prices reflect prevailing market

---

[16] *Services*, Game Point Cap., https://perma.cc/7WJY-ZEKV; *see also* Paul Steinbach, *UConn Insured Basketball Coach Bonuses and Saved Nearly $3M*, Athletic Bus. (Apr. 23, 2024), https://perma.cc/XLY7-LBFJ (Game Point Capital wrote insurance contract that saved university nearly $3 million in bonus payments to coaches related to NCAA tournament performance).

[17] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

[18] *See* Comment Letter from Caitlin Starbuck, Global Head of Compliance, Susquehanna International Group, LLP to Commodity Futures Trading Comm'n (Apr. 30, 2026), https://perma.cc/YCB5-AMNC.

[19] *See* Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management,* InGame (Oct. 20, 2025), https://perma.cc/BT4A-BK8T.

[20] Cathrine Gioino, *This NYC Bar Just Covered Everyone's Tabs Because the Knicks Won, and Used Kalshi to Hedge Their Bets*, Fortune (June 3, 2026), https://perma.cc/J5LF-GXEZ; *see also* Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win. Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM.

[21] Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679.

opinions and conditions. For example, a company that sponsors a professional sports team might look to a prediction market to assess how well the team is predicted to perform, and thus how lucrative its sponsorship is likely to be. That informational function is especially valuable because sports are an institutional-grade asset class: the business of sports is a $2.5 trillion global ecosystem, live media rights are worth more than $60 billion annually, and the global sponsorship market is approaching $100 billion a year and is expected to double over the next decade.[22] Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions. This is not theoretical. Kalshi has announced partnerships with CNN, CNBC, and FOX, which make use of its market data in their reporting.[23]

40. Kalshi has also launched a platform, Kalshi Research, to share market data with academics and promote research derived from the same.[24] Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event. *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

---

[22] Al Tylis et al., *The Financing Gap in Sports: Unlocking a $2.5 Trillion Opportunity* 3-4, Apollo (Dec. 2025).

[23] *See* James Faris, *Prediction giant Kalshi strikes a new media partnership with CNBC, days after its CNN deal*, Bus. Insider (Dec. 4, 2025), https://perma.cc/6XNU-XXND; R.T. Watson, *Kalshi inks exclusive CNBC deal as prediction markets surge into mainstream media*, The Block (Dec. 4, 2025), https://perma.cc/D2SH-ZLF7; *FOX to Integrate Kalshi Forecasts Across FOX News Media and FOX One Platforms*, FOX (Apr. 7, 2026), https://perma.cc/Y49P-D4PZ.

[24] *See Kalshi launches new research arm*, Kalshi News (Dec. 22, 2025), https://perma.cc/9MTE-VUGG.

**B. The CEA Establishes an Exclusive Federal Scheme for Regulating Event Contracts Traded on DCMs, including Kalshi.**

41. The CEA establishes a comprehensive federal scheme for regulating the trading of derivatives—including event contracts.

42. Under that scheme, the public can only trade event contracts and other derivatives on a board of trade like Kalshi that the CFTC has designated as a contract market, or DCM. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a). To be designated as a DCM, an entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. *Id.* §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. *Id.* § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. *Id.* § 38.3(a)(1).

*43.* The CEA expressly grants the CFTC "exclusive jurisdiction" over derivatives traded on DCMs—including event contracts. 7 U.S.C. § 2(a)(1)(A). Specifically, the statute provides that the CFTC "shall have exclusive jurisdiction" that covers "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' [or other specified instruments]), and transactions involving swaps or contracts of sale of

a commodity for future delivery" where the derivative is "traded or executed on a contract market designated pursuant to section 7." *Id.*

44. The CEA then defines "swap" to cover a wide range of instruments including event contracts. It specifies that a "swap" includes "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). And lest there be any doubt, it includes a catch-all defining "swap" to cover any instrument "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

45. The term "commodity" is given a similarly broad meaning, which includes occurrences. *Id.* § 1a(9). The CEA includes a special category known as "excluded commodit[ies]" (because they are excluded from certain statutory restrictions on trading) that covers intangibles like an interest rate, *id.* § 1a(19)(i), or "an occurrence, extent of an occurrence, or contingency . . . beyond the control of the parties to the relevant contract" and "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). The CEA therefore makes clear that "event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities" that are based on an "occurrence, extent of an occurrence, or contingency." *Id.* § 7a-2(c)(5)(C)(i).

46. The CEA also contains a "Special [R]ule" for "Event [C]ontracts." *Id.* Recognizing that certain event contracts might warrant closer CFTC scrutiny, Congress authorized the CFTC to review and prohibit six categories of contracts if it concludes they are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(ii).

47. The Special Rule provides that the CFTC "may"—but need not—"determine" that event contracts are contrary to the public interest if they "involve":

(I) activity that is unlawful under any Federal or State law;
(II) terrorism;
(III) assassination;
(IV) war;
(V) gaming; or
(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.* § 7a-2(c)(5)(C)(i); *see* 17 C.F.R. § 40.11. No such contract "determined by the Commission to be contrary to the public interest" may be listed on a DCM. 7 U.S.C. § 7a-2(c)(5)(C)(ii). Absent an adverse public-interest determination, however, Congress did not bar event contracts involving the Special Rule's enumerated activities.

48. The CEA also includes a number of provisions that expressly address the states' regulatory and enforcement powers. Most notably, immediately after Section 2(a) grants the CFTC "exclusive jurisdiction" over derivatives trading "on a contract market designated pursuant to" 7 U.S.C. § 7, the statute provides that "*[e]xcept as hereinabove provided*, nothing contained in this section shall . . . supersede or limit the jurisdiction . . . of any State." 7 U.S.C. § 2(a)(1)(A). The clear implication is that the CEA "supersede[s]" state authority regarding trading on DCMs, but not off.

49. Both the "exclusive jurisdiction" provision and this savings clause were introduced to the statute in 1974 after decades of debate about whether and to what extent states should be able to apply their laws—including their gambling laws—to trading on DCMs. When the CEA was first enacted in 1936, states often attempted to apply their gaming laws to trading on designated markets, and the Supreme Court interpreted some of the language in the original CEA to authorize this practice to continue, thereby permitting concurrent state and federal regulation of

derivatives markets. Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 670-93 (1982).

50. By 1974, however, Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction." *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong. 128 (1974). Congress therefore both eliminated the language the Supreme Court had interpreted to allow concurrent jurisdiction and added the "exclusive jurisdiction" provision. S. Rep. No. 93-1131, at 31 (1974). Moreover, when the House tried to soften the exclusive-jurisdiction provision by adding the savings clause, the Senate insisted on amending that clause to ensure it applied only "except as hereinabove provided." *Id.* The language ensured that "where the jurisdiction of the [CFTC] is applicable, it supersedes State as well as Federal agencies." *Id.* at 23.

51. Other provisions of the CEA that address the states similarly protect the CFTC's exclusive authority to regulate trading on DCMs, while preserving states' authority to regulate most off-DCM transactions. For example, in 1978, Congress added Section 13a-2, entitled "Jurisdiction of States." That section provides states with some ability to bring suits to enforce the CEA against entities "*other than a contract market*" or other designated trading facility, as well as preserving the states' authority to bring state court proceedings regarding "general civil or criminal antifraud" laws. 7 U.S.C. §§ 13a-2(1), (7) (emphasis added). Similarly, in 1982, Congress added what is now Section 16(e)(1). That provision reiterates that the CEA generally does not preempt other federal or state laws for transactions "not conducted on or subject to the rules of a registered entity," such as a DCM. *Id.* § 16(e)(1)(B)(i). Section 16(e)(2), added in 2000,

goes on to establish certain narrow circumstances in which state "gaming" and "bucket shop[]" laws are preempted even with respect to off-DCM transactions. *Id.* § 16(e)(2).

52. The CEA thus sets out a highly reticulated federal scheme for regulating event contracts and other derivatives traded on DCMs like Kalshi, and it grants the CFTC "exclusive jurisdiction" over event contracts while preserving state authority to regulate transactions that occur outside of a DCM.

53. Congress confirmed the same understanding in the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"). Although UIGEA generally prohibits the use of the internet to transmit wagers between states "where such bet or wager is unlawful," 31 U.S.C. § 5362(10)(A), Congress provided that the term "bet or wager" "does not include" transactions conducted on "a registered entity . . . under the Commodity Exchange Act," *id.* § 5362(1)(E)(ii). UIGEA thus underscores Congress's understanding that state gaming laws do not reach trading on DCMs.

54. In 2020, the CFTC designated Kalshi as a contract market, affirming that its trading platform complies with the CEA. *KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024). Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

55. Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

56. Kalshi offers many kinds of event contracts related to an array of substantive areas like economics, finance, climate, technology, health, crypto, popular culture, and sports. For example, Kalshi's platform currently allows users to trade on the level of US GDP growth in Q2

2026, the closing price of the S&P 500 at the end of 2026, whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. Kalshi also offers contracts on congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

57. Prior to making a contract available for trade on its platform, Kalshi self-certifies to the CFTC, pursuant to section 7a-2(c)(1) of the CEA, that the offering complies with the CEA and CFTC regulations. *See* 7 U.S.C. § 7a-2(c)(1). Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review.

58. The CFTC also has the ability to require Kalshi to submit a "Demonstration of [C]ompliance," which is "a written demonstration, containing supporting data, information and documents" that a DCM is required to file upon request from the CFTC to explain how the DCM "is in compliance with one or more core principles as specified in the request." 17 C.F.R. § 38.5(b).

59. The CFTC did just that with respect to Kalshi's first sports event contracts, and Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations, and the CFTC's jurisdiction over sports event contracts traded on DCMs. *KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *5 (M.D. Tenn. Feb. 19, 2026). The CFTC took no further action and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed, exactly as other derivatives contracts are listed, traded, and closed on the DCMs the CFTC oversees.

60. The CFTC has repeatedly confirmed that Kalshi's contracts—including its sports event contracts—fall within the CFTC's exclusive regulatory jurisdiction. In addition to its recent

NPRM regarding sports event contracts, the CFTC has filed amicus briefs making clear that the event contracts at issue "are 'swaps,' and the CEA gives the Commission 'exclusive jurisdiction' over 'transactions involving swaps' on CFTC-registered Designated Contract Markets." CFTC Amicus Br. at 1. It has also brought lawsuits against ten states that have sought to subject DCMs to state gambling laws,[25] and has obtained preliminary injunctions against state enforcement in district courts in Arizona, Minnesota, and Illinois. *Johnson*, 832 F. Supp. 3d at 967 (enjoining state enforcement action against exchange because exchange and CFTC "are likely to prevail on their claim that the CEA's grant of 'exclusive jurisdiction' preempts the State's enforcement of its gambling laws against DCM operators offering event contracts"); *United States v. Minnesota*, 2026 WL 2150211, at *18; *Raoul*, 2026 WL 2969682, at *18.

**C. The CFTC Has Proposed and Adopted a Detailed Regulatory Framework Governing Sports Event Contracts on DCMs.**

61. In June 2026, the CFTC issued a 267-page NPRM underscoring its exclusive jurisdiction over prediction markets—and sports event contracts traded on those markets. 91 Fed. Reg. at 35,806. The NPRM confirms that the CEA "expressly preempts state laws" with respect to event contracts on DCMs. *Id.* at 35,808. It underscores that event contracts are "swaps" that serve "price discovery" functions and "allow market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists," including "sporting events" that "generate billions of dollars in economic activity and materially affect both regional and national markets." *Id.* at 35,807-08 (citation modified).

62. In October 2026, the CFTC took two further steps under its express authority to define "swap." *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 (2024); 15 U.S.C. §

[25] *See generally* CFTC Complaints.

8302(d)(1). First, on October 9, it issued an Interim Final Rule, "effective immediately," excluding from the "swap" definition contracts "regulated as gaming or gambling under applicable State or Tribal law" and "not traded on a board of trade" or other "organized exchange." 91 Fed. Reg. at 65,971, 65,979. The rule rejects the "erroneous premise" "that if event contracts are swaps, then casino-style gambling products must also be swaps." *Id*. at 65,977.

63. Second, the same day, the CFTC proposed defining "swap" to include "[e]vent contracts, including those based on sports-[related] . . . events." 91 Fed. Reg. at 66,031. The CFTC explains that the statute already covers these contracts, and that the rule "provides an independent legal basis to deem these contracts as swaps." *Id*. at 66,025-26, 66,028. Together, these rulemakings confirm that Kalshi's sports event contracts are swaps within the CFTC's exclusive jurisdiction.

**D. Missouri's Attorney General Has Issued a Cease-and-Desist Letter Threatening Criminal and Civil Enforcement Against Kalshi's Event Contracts.**

64. Earlier this year, Defendant Leara, on behalf of the Missouri Gaming Commission, submitted a public comment to the Commodity Futures Trading Commission urging that "[g]aming regulation is properly left to the states," and that the CFTC "properly reserve jurisdiction over sports event contracts for the states, as intended by Congress." Comment Letter from Mo. Gaming Comm'n to Commodity Futures Trading Comm'n (Apr. 30, 2026), https://perma.cc/9D8J-GEMQ. Defendant Leara went on to state that event contracts contingent on the outcome of sporting events or an athlete's performance "are not swaps or commodities under the CEA, but rather these activities constitute sports wagering or gaming activities barred by 17 CFR § 40.11(a)," and that "[u]nlicensed sports event contracts constitute unregulated and unlawful activity in Missouri." *Id.* Defendant Leara further asserted that there is "no functional

difference" between a consumer's purchase of a position on the outcome of a sporting event and "a legal and regulated wager made on those same events." *Id.*

65. On September 16, 2026, Attorney General Hanaway issued the cease-and-desist letter to KalshiEX LLC. The letter is captioned "Unlicensed Sport Wagering Operations in Missouri" and asserts that Kalshi is an online sports wagering platform offering sports wagering to individuals located in Missouri without submitting to regulation by the Missouri Gaming Commission. Ex. 1 at 1.

66. The cease-and-desist letter invokes Missouri's sports-wagering framework, including Mo. Const. art. III, § 39(g)1, and states that Missourians approved a "well-regulated sports wagering industry" in December 2024. It gives Kalshi "two options": (1) cease and desist from its Missouri sports wagering activity; or (2) obtain a Missouri Gaming Commission license, pay all associated state taxes and fees, and stop offering sports wagering to persons in Missouri under 21. Ex. 1 at 1.

67. The cease-and-desist letter asserts that Kalshi violates Missouri's prohibition on wagers by persons under 21, 11 C.S.R. § 45-20.360(1)(A), and the "affirmative duty" imposed by § 45-20.360(6) on online sports wagering platforms to "actively prevent" such wagers. It points to Kalshi's Member Agreement, which permits anyone who is "the age of majority in [their] state of residence"—18 in Missouri—to place wagers through Kalshi's platform. Ex. 1 at 2.

68. The letter's demands would require Kalshi to impose Missouri-specific participation restrictions and age-and geography-based screening on a nationwide federally regulated exchange. *See* Ex. 1. Those restrictions would place Kalshi in considerable tension with the impartial-access requirement of Core Principle 2, 17 C.F.R. §§ 38.150, 38.151(b), and,

depending on the CFTC's interpretation of its Core Principles, could make compliance with both federal and state requirements impossible.

69. The letter directs Kalshi to "obtain a license" from the Missouri Gaming Commission. *Id.* But Missouri's sports wagering regime provides only limited avenues for obtaining a license to offer sports wagering. The State authorizes two categories of operator licenses: retail licenses, which permit in-person sports wagering, and mobile licenses, which permit wagering through online platforms. Mo. Const. art. III, §§ 39(g)(16)(d), (f), (i). Retail licenses are available only to licensed casino operators (Class B licensees), professional sports teams, or sports wagering operators acting on their behalf pursuant to a commercial agreement. *Id.* § 39(g)(4)(a); 11 C.S.R. §§ 45-20.020(2)–(3). The Constitution likewise restricts mobile licenses to owners of excursion gambling boats, professional sports teams, or operators acting on their behalf. Mo. Const. art. III, § 39(g)(4)(b). Neither pathway is available to Kalshi, which is not a qualifying casino or professional sports team and has no commercial agreement with either.

70. Missouri separately permits the Commission to issue up to two mobile licenses directly to sports wagering operators without a casino or sports team affiliation. *Id.* § 39(g)(4)(c); 11 C.S.R. § 45-20.050(1). But those licenses have already been awarded. On August 15, 2025, the Commission selected DraftKings and Circa Sports as the two qualified applicants for the direct mobile licenses, and on April 29, 2026, it granted each of them a license. *See* Mo. Gaming Comm'n, Resolution No. 25-139, Regarding Selection of Top Two Qualified Applicants for a Direct Mobile License (Aug. 15, 2025), https://perma.cc/N6KD-CCAD; Mo. Gaming Comm'n, Resolution No. 26-022, Regarding Licensure of Mobile Sports Wagering Platform Circa Hospitality Group I LLC, d/b/a Circa Sports (Apr. 29, 2026), https://perma.cc/L35G-E8VD; Mo. Gaming Comm'n, Resolution No. 26-023, Regarding Licensure of Mobile Sports Wagering

Platform DK Crown Holdings Inc., d/b/a DraftKings (Apr. 29, 2026), https://perma.cc/TH9Z-3BPL. Thus, Kalshi cannot obtain an independent mobile license either. And even if Kalshi could apply for an independent mobile license, an application does not guarantee a license, as Kalshi would still have to pass a suitability investigation under 11 C.S.R. § 45-20.060. That rule permits the Commission to deny a license based on conduct that "poses a threat to the public interests of the state of Missouri." *Id*. § 45-20.060(3)(E)(1).

71. The cease-and-desist letter's directive that Kalshi "obtain a license" thus does not provide Kalshi with a path to compliance. Yet, the cease-and-desist letter threatens enforcement action if Kalshi does not change its operations and demands confirmation of Kalshi's compliance with Missouri law or cessation of its Missouri sports wagering activities within thirty days of September 16, 2026—on or about October 16, 2026. On October 15, 2026, the Attorney General's Office granted Kalshi a two-week extension of that deadline, through October 30, 2026, while stating that there was no ability for Kalshi to avoid enforcement after that period ended. The letter's express threat and deadline, as extended, further confirm that Defendants intend to take action against Kalshi unless it complies, leading Kalshi to believe an enforcement action is imminent. Ex. 1.

72. Missouri law, including Mo. Rev. Stat. §§ 572.020, 572.030, 572.040, 572.050, 572.060, 572.070, 11 C.S.R §§ 45-20.150, 45-20.360(8), and Mo. Const. art. III, § 39(g), contemplates criminal and civil sanctions for unlawful gambling and sports wagering activity. Violations of Missouri's anti-gambling laws may result in criminal prosecution, including felony charges. Mo. Rev. Stat. §§ 572.020, 572.030, 572.040, 572.050, 572.060, 572.070. Missouri law also authorizes administrative fines of $50,000 per violation, or $100,000 for violations arising from the same occurrence of events. Mo. Const. art. III, § 39(g)(4)(k); 11 CSR 45-20.150(4), (5).

Defendants' actions make abundantly clear their belief that Kalshi's event contracts fall within that category.

73. The CFTC has, in an exercise of its exclusive jurisdiction, permitted Kalshi to offer event contracts for trade on its exchange, including its sports event contracts, which the CFTC views as falling comfortably within the CEA and under its own regulatory authority. CFTC Amicus Br. at 17 ("The Commission has regulated event contracts—whether styled as binary options or swaps—for decades, and as the events underlying those contracts have evolved to include sports, the Commission has continued to exercise the same jurisdiction it always has."). Nevertheless, the Attorney General's cease-and-desist letter, the Commission's public position to the CFTC, and the Attorney General's recent signing of an amicus brief arguing that Kalshi's contracts violate state gambling laws and asking the Supreme Court to review the decision in Kalshi's favor by the United States Court of Appeals for the Third Circuit, make clear that Defendants intend to take action against Kalshi unless it ceases offering sports wagering in Missouri or satisfies the State's licensing, tax, fee, and age-related demands. And on October 27, 2026, the Solicitor General of Missouri told Kalshi that it could not agree to withhold enforcement against Kalshi, placing Kalshi at imminent risk that Defendants would pursue an enforcement action against it.

**E. Defendants Have Not Provided Assurances of Non-Enforcement.**

74. Defendants have provided no assurance that they will refrain from enforcing Missouri law against Kalshi, and no non-enforcement agreement exists between Kalshi and Missouri. The September 16, 2026 cease-and-desist letter instead gives Kalshi only two options: cease and desist from offering sports wagering in Missouri, or obtain a Missouri Gaming Commission license, pay all associated state taxes and fees, and comply with Missouri regulations.

It further warns that Missouri will pursue available enforcement actions and take legal action against Kalshi if Kalshi persists. While Missouri provided Kalshi with an additional 14-day period for compliance, Defendants have unambiguously stated that they intend to enforce Missouri law against Kalshi.

75. Kalshi therefore has no option but to seek judicial relief. The cease-and-desist letter makes clear that Defendants believe Kalshi's offering of sports event contracts in Missouri violates Missouri law and that Kalshi may be subjected to enforcement unless it ceases operations or submits to the State's requirements. Because the letter provides no assurance of non-enforcement, Kalshi and its users face a threat of irreparable harm, leaving Kalshi with no choice but to protect its commercial interests and those of its users and bring this suit.

76. Kalshi will inform Defendants of its filing and intent to seek preliminary injunctive relief. Given the letter's express threat and deadline, Kalshi will also inform Defendants that, unless Defendants assure Kalshi they will not begin an enforcement proceeding while Kalshi's motion for a preliminary injunction is pending, Kalshi will additionally seek a temporary restraining order barring such an action.

## REQUISITES FOR RELIEF

77. As a result of Defendants' threatened conduct described above, including Attorney General Hanaway's September 16, 2026 cease-and-desist letter affirmatively threatening available enforcement actions and legal action against Kalshi, there is a strong likelihood that Defendants will take action, including, but not limited to, seeking to enforce preempted state law in violation of the Supremacy Clause of the U.S. Constitution, which will subject Kalshi and its customers to irreparable harm.

78. An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein, including threats to

Kalshi, has already resulted in, and will continue to result in, irreparable injury to Kalshi, including but not limited to economic hardship, lost business opportunities, and impairment of existing contractual relationships.

79. Kalshi has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Kalshi therefore seeks declaratory and injunctive relief restraining Defendants from enforcing Missouri's gambling and sports wagering laws that interfere with the operation and function of Kalshi's DCM described herein.

**COUNT I**

**(Supremacy Clause—Preemption by Commodity Exchange Act)**

80. Plaintiff incorporates all prior paragraphs by reference.

81. The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

82. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

83. Congress expressly preempted state law by giving the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges, including the trading of event contracts on DCMs like Kalshi. 7 U.S.C. § 2(a)(1)(A).

84. In threatening to enforce Mo. Rev. Stat. §§ 513.660, 572.010, 572.020, 572.030, 572.040, 572.050, 572.060, 572.070, 407.020, Mo. Const. art. III, § 39(g), and 11 C.S.R. §§ 45-20.010 *et seq.* against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive

authority to regulate futures trading on CFTC-regulated exchanges. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter.

85. In addition, federal law occupies the entire field of regulating trading on designated contract markets, and Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause. As the Third Circuit held in concluding that state laws are field preempted, the CEA's text "preempts state laws that directly interfere with swaps traded on DCMs," and because Kalshi's event contracts are swaps traded on a CFTC-licensed DCM, "the CFTC has exclusive jurisdiction." *Flaherty*, 172 F.4th at 225-26.

86. Missouri law is also preempted as applied to Kalshi because it conflicts with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized (and to subject the website on which such contracts are offered to abatement), which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. Congress passed the 1974 Amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* The Seventh Circuit thus explained that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted).

87. This conflict with the CEA is even clearer when considering that 49 other states and the District of Columbia might similarly attempt to subject Kalshi to their own state laws, producing the patchwork of state-by-state regulation Congress sought to prevent. As the Third Circuit held, state regulation of Kalshi's event contracts "would create an obstacle to executing the [CEA] because such state enforcement would prohibit Kalshi, which operates a licensed DCM under the exclusive jurisdiction of the CFTC, from offering its sports-related event contracts," resulting in "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230.

88. Additionally, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law adopts a different method of enforcement that hampers the "careful balance struck by Congress," *Arizona v. United States*, 567 U.S. 387, 406 (2012); *see also Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Forest Park II v. Hadley*, 336 F.3d 724, 733 (8th Cir. 2003). Where Congress grants federal officials broad enforcement discretion, a state regime that allows for state prosecutions of the same actions "contradict[s] the policy decisions of Congress, and the policy decisions made with the discretion that Congress grants to federal . . . officials." *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 923 (8th Cir. 2025). Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts for trading by self-certifying that these contracts comported with federal law. The CFTC had the authority to review those self-certifications if it concluded contracts fell within a category enumerated in the Special Rule and were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so. The CFTC's Enforcement Division has authority to investigate and initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings, but, again, it chose not

to do so. Congress thus gave the CFTC a variety of tools for enforcing federal law against federally designated contract markets and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate. Subjecting federally regulated exchanges to state laws like Missouri's would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Iowa Migrant Movement*, 157 F.4th at 927.

89. Furthermore, Defendants' demands and their threatened enforcement of Missouri law conflict with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market depends. The CFTC's Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. §§ 38.150, 38.151(b) (emphasis added). If Kalshi is forced to cease offering sports event contracts to Missouri residents (or to impose Missouri-specific age- and geography-based screening on its nationwide exchange), it will inevitably violate that "impartial access" requirement because, as the CFTC itself has recognized, a DCM is "require[d]" by federal law "to provide 'impartial access to its markets and services.'" CFTC Amicus Br. at 21 (citation omitted). In addition, Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and *market disruptions*." 17 C.F.R. § 38.255 (emphasis added). Abruptly closing Kalshi's event contracts to some users based on geography would constitute exactly the sort of market disruption the CFTC has directed Kalshi to prevent. Depending on the CFTC's interpretation of its Core Principles, it could well be that Kalshi's "compliance with both federal and state regulations is a physical impossibility"—the paradigmatic case for preemption. *Iowa Migrant Movement*, 157 F.4th at 919 (citation omitted).

90. And even if Kalshi did not cease operations and instead attempted to comply with Missouri's licensing requirements, that path would create its own conflicts with the federal regime.

11 C.S.R. § 45-20.450(1) bars Retail and Mobile licensees from accepting "any wager of any type or kind, unless the type or kind of wager and subject of the wager has been approved by the commission." This requirement conflicts with the federal framework, which permits DCMs to list products through self-certification to the CFTC, requiring only that the submission be received at least one business day before listing; prior CFTC approval is optional, not mandatory. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2. A contract that a DCM may list through this federal process cannot simultaneously be subject to a separate state approval requirement that delays or prevents its listing. By conditioning acceptance on Commission approval, the regulation imposes a state-level approval gate that directly obstructs the federal listing mechanism established by Congress.

91. Missouri's regulations compound this conflict by limiting the universe of permissible events. Under 11 C.S.R. § 45-20.340(1), "Retail licensees and Mobile licensees may only accept wagers on events approved by the commission and published in the catalog of approved events." Any event not in the catalog requires a written request, and the Commission may weigh "[t]he best interests and needs of the Missouri sports wagering industry" in deciding whether to approve it. *Id.* § 45-20.340(4)(A). Missouri separately prohibits wagering on "[a]ny event or portion of an event, or wagering by type or form, which has not been approved by the commission." 11 C.S.R. § 45-20.360(2)(E). The CEA, by contrast, allows event contracts on a much wider range of events. It reaches any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract, agreement, or transaction" and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv). A state-maintained catalog that limits eligible events to those the Commission has blessed, judged partly by the interests of Missouri's sports wagering industry, cannot coexist with a federal

framework that lets DCMs list contracts on the full range of events within the CEA's definition of excluded commodities.

92. Further, 11 C.S.R. § 45-20.360 prohibits specified categories of wagers, while federal law assigns the CFTC the authority to determine, through a public-interest review process that includes a 90-day review period, whether an event contract involving "gaming" or activity unlawful under state law may be listed. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11. Again, this creates a conflict by allowing Missouri to categorically prohibit contracts that Congress has placed within the CFTC's federal review and determination process, thereby displacing the federal framework with a separate state-level restriction.

93. Missouri also claims for itself the public-policy judgment that Congress gave to the CFTC. Under 11 C.S.R. § 45-20.350(1), the Commission "may restrict, limit, or exclude a type, form, or category of wagering, or wagering on a specific sport, event, league, or competition, if it concludes the wagering in question would be contrary to public policy, unfair to patrons, or affects the integrity of a particular sport or the Missouri sports wagering industry." Licensees, sports organizations, universities, and the executive director may request such a restriction. *Id.* § 45-20.350(2). Once the Commission grants such a request, the wager "shall be deemed a prohibited wager," and unredeemed wagers placed before the decision "shall be cancelled." *Id.* §§ 45-20.350(8), (9). The executive director may also temporarily suspend wagering on grounds that include "the public health, safety, morals, good order, or general welfare of the people of the state of Missouri." *Id.* § 45-20.350(10)(A). The CEA, however, assigns public-interest determinations for event contracts to the CFTC. Congress provided that "the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest" if they involve enumerated activities, or "other similar activity determined by the Commission, by rule or

regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Only a contract "determined by the Commission to be contrary to the public interest" is barred from being listed. *Id.* § 7a-2(c)(5)(C)(ii). Section 45-20.350(1) would let a state agency make that same public policy judgment on its own and in a way that differs from the CFTC's, overriding the federal decision-maker Congress chose.

94. Missouri regulations also conflict with federal law on who may participate. Under 11 C.S.R. § 45-20.360(4), "Retail licensees and Mobile licensees shall not accept a wager from a partnership, a corporation, an association, or any other entity that is not an individual." The CEA contains no such limit. Its definition of "person" covers individuals, associations, partnerships, corporations, and trusts. 7 U.S.C. § 1a(38); *see also* 17 C.F.R. § 1.3. The federal framework expressly contemplates business entities trading event contracts, including institutional participants that qualify as "eligible contract participants" under 7 U.S.C. § 1a(18). As a DCM, Kalshi may offer its event contracts for trading to business entities as well as individuals. Complying with § 45-20.360(4) would force Kalshi to exclude a whole class of market participants that federal law allows to trade on its exchange. That would split Kalshi's single, nationally regulated market along lines the CEA does not draw.

95. Defendants may not enforce Missouri's gambling and sports wagering laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1. Enter a judgment declaring that Mo. Rev. Stat. §§ 513.660, 572.010, 572.020, 572.030, 572.040, 572.050, 572.060, 572.070, 407.020, Mo. Const. art. III, § 39(g), 11 C.S.R. §§ 45-20.010 *et seq.* and any other Missouri law that attempts to regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff and its affiliates, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2. Enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Mo. Rev. Stat. §§ 513.660, 572.010, 572.020, 572.030, 572.040, 572.050, 572.060, 572.070, 407.020, Mo. Const. art. III, § 39(g), 11 C.S.R. §§ 45-20.010 *et seq.* and any other Missouri law that attempts to regulate Plaintiff's exchange, against Plaintiff and its affiliates;

3. Any other relief within this Court's discretion that it deems just and proper.

Dated: October 27, 2026

Plaintiff

KALSHIEX LLC,

By its Attorneys

*/s/ David J. Simmons*

Kevin F. Hormuth (MO# 48165)
David P. Niemeier (MO# 50969)
David J. Simmons (MO# 53801)
**UB GREENSFELDER LLP**
10 South Broadway, Ste. 2000
St. Louis, MO 63102-1747
Telephone: 314-345-5400
Facsimile: 314-241-8624

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
Colleen Roh Sinzdak (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice* forthcoming)
Katherine Kelly Fell (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Nicole D. Valente (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*